UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ALAN JOSEPH BAUER; DOUGLAS S. RABIN; VIVIAN STEIR RABIN; RODDY TEEPLE; ANDREW NEFF; NANCY NEFF; RICHARD SANDERS POLIN; TAMMIE PUROW; MIMI JANKOVITS; and DAVID GENET,

    Plaintiffs,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION) and THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS,

    Defendants.

Civil Action No. 1:24-cv-10404-GAO

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**INTRODUCTION**

President and Fellows of Harvard College ("Harvard")[1] condemns antisemitism, just as it condemns all forms of discrimination based on race, religion, national origin, or shared ancestry. Conduct that in any way targets Harvard's Jewish students, faculty, or staff for discrimination or harassment is unacceptable and antithetical to Harvard's core values. Since the horrific events of October 7, 2023, Harvard has undertaken efforts to protect its Jewish students and to make clear that antisemitism has no place at Harvard.

In this lawsuit, a collection of Harvard alumni who graduated between the early 1970s and the mid-1990s attempt to weigh in on Harvard's ongoing battle against antisemitism by

---

[1] The Board of Overseers is not a proper defendant in this action, because it is not a corporate entity independent of President and Fellows of Harvard College.

seeking a broad "injunction ordering Harvard to take concrete and affirmative steps to end antisemitism on campus and hold accountable those who allowed antisemitism to fester." Complaint, Dkt. No. 1, ¶ 3. These same alumni also seek "restitution" from Harvard for the alleged "devaluation of their Harvard degrees" caused by Harvard's supposed "failure to address its antisemitism problem." *Id.* Advancing claims arising out of a supposed implied contract they claim to have with Harvard, Plaintiffs argue that Harvard has breached a contractual obligation to Plaintiffs to uphold "a certain standard of higher education and reputability," *id.* ¶¶ 79, 83*,* and that, because of Harvard's conduct, Plaintiffs are no longer able to enjoy what they describe as "the life-long prestige of having graduated from Harvard," *id.* ¶ 79.

As explained below, Plaintiffs' claims against Harvard are meritless and should be dismissed with prejudice.

*First*, Plaintiffs fail to identify any enforceable contract between them and Harvard. Their status as Harvard graduates, alone, is insufficient to support their contractual claims. Indeed, while Massachusetts courts have long recognized that the relationship between educational institutions and their current students can, under certain circumstances, be "contractual in nature," that same quasi-contractual relationship simply does not exist between alumni and their alma maters.

*Second*, even if an implied contract between alumni and their alma maters might exist in some limited circumstances, Plaintiffs' allegations in this case fall far short of the specificity required to establish the existence of such a contract.

*Third,* the supposed contract at issue here—an alleged implied agreement between Harvard and Plaintiffs pursuant to which Harvard agreed to "uphold a certain standard of higher education and reputability"—is far too vague and indefinite to be actionable under Massachusetts

law. Indeed, the purported promises that Plaintiffs seek to enforce against Harvard in this case are precisely the type of "aspirational statements" that Massachusetts courts have repeatedly refused to enforce against colleges and universities in the Commonwealth.

*Fourth*, Plaintiffs have failed to allege that the contract upon which they purport to sue is supported by any valid consideration. Their references to long-past enrollment decisions and tuition payments amount to, at most, "past consideration," which is insufficient as a matter of law to support their contract claims against Harvard.

*Finally,* regardless of how Plaintiffs' claims for relief against Harvard might be construed or recast, Plaintiffs simply lack standing to assert any legal claims challenging Harvard's current operational decisions. While their status as Harvard graduates may well give them an impassioned interest in today's activities at the university, that status does not create the type of cognizable interest necessary to confer standing to assert the claims of the type set forth in the Complaint.

The myriad accusations asserted against Harvard throughout Plaintiffs' Complaint are without merit, and the supposed "facts" underlying them are largely inaccurate and misleading. Harvard's many disagreements with Plaintiffs' allegations, however, are not the subject of this Memorandum, because the Complaint contains legal deficiencies that preclude its progress beyond the motion to dismiss stage. Nor can those deficiencies be remedied by any amendment. Accordingly, and for all the reasons set forth below, the Complaint in this case should be dismissed with prejudice.

## BACKGROUND[2]

Plaintiffs in this case are ten Harvard graduates who received various degrees from Harvard between 1973 and 1996. *See* Complaint, Dkt. No. 1, ¶¶ 19–29. In their Complaint, Plaintiffs allege that since the 1920s, but especially over the last decade, Harvard has "foster[ed] and permit[ed] antisemitism" on its campus. *Id.* ¶¶ 35–51. They further allege that since the horrific events of October 7, 2023, Harvard has tolerated antisemitism on campus. *See id.* ¶¶ 52–70.

According to the Complaint, due to Harvard's alleged actions and inactions since October 7, 2023, several employers have expressed their intention to no longer hire Harvard graduates and have rescinded offers of employment to Harvard students. *Id.* ¶¶ 71–73. Harvard has also allegedly been "ridiculed publicly" and "shunned" by the professional world, including through satirical cartoons. *Id.* ¶¶ 74–75.

The Complaint acknowledges that colleges and universities across the country have been grappling with a rise in antisemitism on campus. *Id.* ¶ 76. Although this is a widespread problem, the Complaint alleges that unspecified "[p]eople have explained that . . . Harvard 'ought to be' better," particularly "given its persistent ranking among the top three universities in the United States for an undergraduate degree and among the top five for a law degree or MBA." *Id.* According to Plaintiffs, these rankings require Harvard to adhere to an unelaborated "higher standard than other universities." *Id.*

Plaintiffs further allege that Harvard alumni have "an implied contractual relationship" with their alma mater "by virtue of their enrollment at Harvard and graduation from Harvard's programs." *Id.* ¶ 78. According to the Complaint, the terms of this implied contract are found in

---

[2] Harvard disputes most of Plaintiffs' allegations; however, it recounts the allegations as pleaded in the Complaint for the limited purpose of this Motion to Dismiss.

4

unspecified "handbooks, regulations, codes, policies, and procedures promulgated by Harvard." *Id.* Plaintiffs also point to the Harvard Alumni Association website, which allegedly states (1) that the relationship between Harvard and its graduates is "a lifelong journey with countless avenues to explore"; (2) that "Harvard is here for you during every stage in your career"; and (3) that "[a]s a Harvard alumnus/a, you are entitled to benefits and services from across the University." *Id.* ¶ 76. According to Plaintiffs, under this implied contract, Harvard has agreed to "uphold a certain standard of higher education and reputability," such that all alumni may "enjoy the life-long prestige of having graduated from Harvard." *Id.* ¶ 79. They then assert that Harvard has breached and continues to breach this implied contract "by failing to adequately address antisemitism on its campus." *Id.* Plaintiffs further contend that this breach has "caused the value and prestige of Plaintiffs' Harvard degrees to be diminished" and has "made a mockery out of Harvard graduates in the employment world and beyond." *Id.* ¶ 80.

Plaintiffs also contend that their implied contract with Harvard includes an implied covenant of good faith and fair dealing that obligates Harvard (1) to "act in good faith to uphold the values and morals that historically made it an elite institution and eliminate, or at least, not condone antisemitism"; (2) to "uphold a certain standard of higher education and reputability"; and (3) to "not condone antisemitism and harassment." *Id.* ¶ 83. The support for this implied covenant is allegedly found, again, in the current Harvard Alumni Association website, which allegedly states that "[t]hrough the Harvard Alumni Association (HAA) and each of Harvard's Schools, alumni like you have access to opportunities to expand your network, meet professionals in your field, and grow your skill set." *Id.* Plaintiffs allege that Harvard's failure to "adequately address antisemitism on its campus" constitutes a breach of this implied covenant

because Harvard's conduct has "destroyed Plaintiffs' reasonable expectations regarding the fruits" of their alleged contract with Harvard. *Id.*

## STANDARDS OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing plausibility, a Court does not credit "mere conclusory statements" or "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557). In ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014) (quoting *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original).

A motion to dismiss based on a lack of standing arises under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Blum v. Holder*, 744 F.3d 790, 795–96 (1st Cir. 2014). "'The party invoking federal jurisdiction bears the burden of establishing' standing." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 412 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To demonstrate standing, the plaintiffs must "'allege[] such a personal stake in the outcome of the controversy' as to warrant [their] invocation of federal jurisdiction and to justify exercise of the court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

**ARGUMENT**

I. **Plaintiffs' Breach of Contract Claim Fails as a Matter of Law.**

Under Massachusetts law, the elements of a breach of contract claim are that (1) "there was an agreement between the parties"; (2) "the agreement was supported by consideration"; (3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; (4) "the defendant committed a breach of the contract"; and (5) "the plaintiff suffered harm as a result." *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020) (quotations omitted). A plaintiff seeking recovery on a breach of contract claim has the burden of proving the existence of a contract. *See Carney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967).

Moreover, for a contract to be enforceable in Massachusetts, "[a]ll the essential terms of the contract must be sufficiently definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." *Moore v. La-z-Boy, Inc.*, 639 F. Supp. 2d 136, 139 (D. Mass. 2009) (quoting *Cygan v. Megathlin*, 326 Mass. 732, 733–34 (1951)). Whether the terms of a purported contract are sufficiently definite to be enforceable is a question of law for the court. *See Conway v. Licata*, 104 F. Supp. 3d 104, 114 (D. Mass. 2015).

A. **Plaintiffs' Status as Harvard Graduates Is Insufficient to Support a Breach of Contract Claim.**

The gravamen of Plaintiffs' claims in this case is their assertion that they "have an implied contractual relationship with Harvard by virtue of their enrollment at Harvard and graduation from Harvard's programs." Complaint, Dkt. No. 1, ¶ 78. But Plaintiffs' status as Harvard graduates, alone, does not create the type of implicit contractual relationship that Plaintiffs allege.

To the contrary, courts routinely refuse to recognize claims by alumni seeking to assert ill-defined breach of contract claims against the educational institutions from which they have graduated. *See Young v. Boston University*, 64 Mass. App. Ct. 586, 589 (2005) (explaining that a brochure provided to a university graduate describing various alumni benefits "did not constitute a contract" between the university and its alumnus); *see also Annabi v. New York University*, 2023 WL 6393422, at *9 (S.D.N.Y. Sept. 29, 2023) (dismissing breach of contract claim brought by alumnus against university seeking to enforce alleged "eligibility" for "alumni benefits"); *Shaw Alumni and Friends, Inc. v. Bell*, 2016 WL 3080792, at *3 (E.D.N.C. May 31, 2016) (finding that plaintiffs had not plausibly alleged that chairmen of university board of trustees had "[c]ontract with each student, faculty member, and alumnus of the University to protect . . . the value of their degrees")[3]; *Cheves v. Trustees of Columbia University*, 89 A.D.3d 463, 464 (N.Y. App. Div. 2011) (explaining that allegations regarding Alumni Relations brochure that listed "certain benefits and services generally available to alumni" were insufficient to support breach of contract claim by alumnus). In rejecting these putative contract claims, courts have recognized that the relationship between an educational institution and its alumni is markedly different than any quasi-contractual relationship that may exist between educational institutions and their current students. *See, e.g.*, *Jenkins v. Howard University*, 2023 WL 3948815, at *5 (D.D.C. June 12, 2023) (explaining that while relationship between university and its students may, at times, be "contractual in nature," "relationship between [a university] and its *former* students" presents "more attenuated situation") (emphasis in original) (quotations and citations omitted).

---

[3] The *Shaw* court found that the plaintiffs' allegation that such a contract existed was so "ludicrous" that it issued an order to show cause why it should not impose sanctions pursuant to Fed. R. Civ. P. 11. *Shaw Alumni and Friends, Inc.*, 2016 WL 3080792, at *3.

In their breach of contract claim, Plaintiffs rely upon an alleged "student-university contract" when they reference various "handbooks, regulations, codes, policies and procedures promulgated by Harvard." *See* Complaint, Dkt. No. 1, ¶ 78. To be sure, courts in Massachusetts have long recognized that the relationship between educational institutions and their current students can at times be "contractual in nature." *See Doe v. Stonehill College, Inc.*, 55 F.4th 302, 316–17 (1st Cir. 2022); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000); *see also Dinu v. President and Fellows of Harvard College*, 56 F. Supp. 2d 129, 130 (D. Mass. 1999) ("That the relationship between a university and its students has a strong, albeit flexible, contractual flavor is an idea pretty well accepted in modern case law"). Moreover, the terms governing this student-university quasi-contractual relationship can be informed by "statements in handbooks, policy manuals, brochures, catalogues, advertisements and other promotional materials." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997).

But, of course, Plaintiffs admittedly are *not* students at Harvard. *See* Complaint, Dkt. No. 1, ¶¶ 19–20. And *nothing* in Massachusetts or First Circuit case law remotely suggests that a similarly "unique" contractual-type relationship exists between educational institutions and their graduates. *Guckenberger*, 974 F. Supp. at 150. To the contrary, the one Massachusetts court that has specifically considered a generalized breach of contract claim by a university graduate against his alma mater has expressly rejected it. *Young*, 64 Mass. App. Ct. at 589.[4] It is telling that the Plaintiffs failed to identify any handbook, regulation, code, policy, or procedure that sets

---

[4] As discussed in greater detail below, *see infra* pp. 16–18 courts have regularly refused to recognize any ongoing relationship—contractual or otherwise—that might support claims by alumni against their alma maters.

forth protections for or obligations to alumni relating to the subject matter of the Complaint. For these reasons alone, Count I must be dismissed.

> **B.    Plaintiffs Have Not Alleged Facts with Sufficient Specificity to Support the Existence of an Implied Contract with Harvard.**

Moreover, even if some graduates of educational institutions *could* assert certain contract claims against their alma maters, Plaintiffs have not done so here. Specifically, other than Plaintiffs' broad and generalized allegations regarding their "enrollment and graduation from Harvard's programs," Complaint, Dkt. No. 1, ¶ 78, the Complaint fails to describe with any specificity how the supposed implied contract between Plaintiffs and Harvard was formed, much less its terms. That failure also requires dismissal of the breach of contract claim set forth in Count I.

The First Circuit's decision in *Squeri v. Mount Ida College*, 954 F.3d 56 (1st Cir. 2020) is instructive here. In that case, the First Circuit affirmed the district court's dismissal of a breach of contract claim that had been brought by several students against a college that had abruptly shut down with approximately six weeks' notice. *Id.* at 71. The *Squeri* court explained that the mere allegations that plaintiffs had enrolled at the college and that a "a contract was formed" did not adequately describe "the terms of any such contract or that specific terms required earlier disclosure of the closing." *Id.* Accordingly, the First Circuit concluded that "there was insufficient specificity" to support the plaintiffs' breach of contract claim. *Id.* at 72.[5]

So too here. Like the *Squeri* plaintiffs, Plaintiffs in this case have based their implied contract claim entirely upon allegations that invoke little more than their prior enrollment at the

---

[5] In reaching this conclusion, the *Squeri* court explained that, under Massachusetts law, plaintiffs asserting claims for breach of contract must "state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof." *Squeri*, 954 F.3d at 71 (quoting *Tel. Answering Serv. of Bos., Inc. v. New England Tel & Tel. Co.*, 358 Mass 822, 822 (1971)) (internal citations omitted).

educational institution with which they have allegedly contracted. Complaint, Dkt. No. 1, ¶ 78. Nowhere in the Complaint do Plaintiffs allege the precise terms of that supposed implied contract with Harvard, much less the steps Harvard was allegedly obliged to take in order to comply with those alleged terms. Thus, just as in *Squeri*, Plaintiffs' contract claim should be dismissed for "insufficient specificity." *Squeri*, 954 F.3d at 72.

### C. The Implied Contract Alleged in the Complaint Is Insufficiently Definite to Be Enforceable.

Plaintiffs' breach of contract claim against Harvard fails for another independent reason: to the extent that any purported contractual terms are alleged in the Complaint, they are too vague and indefinite to be actionable under Massachusetts law. Indeed, Plaintiffs' allegation that Harvard "committed and agreed to uphold a certain standard of higher education and reputability such that Plaintiffs would enjoy the life-long prestige of having graduated from Harvard" is precisely the type of alleged contractual term that Massachusetts courts have regularly rejected as unenforceable. *G. v. Fay School*, 931 F.3d 1, 12–13 (1st Cir. 2019) (explaining the difference between "well defined procedures and policies, which can form contractual promises," and "'generalized representations,' which cannot") (quoting *Shin v. Mass. Inst. Of Tech.*, 2005 WL 1869101, at *7 (Mass. Super. Ct. June 27, 2005)).

Massachusetts courts have been careful to distinguish specific, potentially enforceable promises made by educational institutions to their students from other, "aspirational statements" that are simply not enforceable as a matter of law. *See Fay School*, 931 F.3d at 12 (finding that statements such as "[m]utual respect and civility are a central aspect of healthy communities" and "[w]e expect all members of the community to respect the rights of others and to behave appropriately at all times" were insufficient to form a contract); *Wu v. Ma,* 2023 WL 6318831, at *1 (D. Mass., Sept. 28, 2023) (concluding that college's commitment "to offering students a

11

nurturing, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection and sound decision making" was insufficiently definite to form an enforceable contract); *Brown v. Suffolk Univ.*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021) (statement that law school's disability services "serves as a valuable resource for students with disabilities . . . to promote an understanding and awareness of accessibility issues . . . in order to provide a supportive and engaging setting for our students" was too indefinite to create a contractual obligations); *Shin*, 2005 WL 1869101, at *7 (statements by university that "care givers also will help you maintain good health," that "[w]e want to help you maintain your physical, psychological and emotional well-being," and that the department "has the responsibility to provide high quality, low barrier comprehensive health services to the MIT Community" did not create enforceable contractual obligations); *cf. Czerwienski v. Harvard University*, 666 F. Supp. 3d 49, 100–01 (D. Mass. 2023) (explaining distinction between generalized aspirational statements and procedural promises that are sufficiently specific to be enforceable).

Plaintiffs' core contractual allegation in this case—that Harvard has agreed to "uphold a certain standard of higher education and reputability" so that Plaintiffs could enjoy "the life-long prestige of having graduated from Harvard"—is plainly too indefinite to support a binding contract. Plaintiffs point to no definition of that "certain standard of higher education" that could plausibly be enforced by this Court. Nor does the Complaint describe with any reasonable specificity an enforceable definition of the "life-long prestige" that Harvard has allegedly agreed

to provide to Plaintiffs.⁶ For those additional reasons, Plaintiffs' breach of contract claim must be dismissed. *See Fay School*, 931 F.3d at 12–13.

Nor is Plaintiffs' implied contract claim helped by the Complaint's references to statements on the Harvard website or the website maintained by the Harvard Alumni Association ("HAA"). Complaint, Dkt. No. 1, ¶¶ 35, 76. The "diversity and inclusion" statement from the Harvard website referenced in the Complaint allegedly states that "[w]e all belong here" and that "[t]ogether, we strive to create an environment that values diversity, promotes an inclusive culture, and establishes a profound sense of belonging for each member of our community"). *Id.* ¶ 35. The HAA website allegedly states that "Harvard is a lifelong journey with countless avenues to explore," that "Harvard is here for you during every stage in your career," and that "[a]s a Harvard alumnus/a, you are entitled to benefits and services from across the University." *Id.* ¶ 76. These statements, much like Harvard's supposed promise to "uphold a certain standard of higher education and reputability," are simply too indefinite and aspirational to support any breach of contract claim by Plaintiffs against Harvard. "Without diminishing the importance of these words, they are exactly the sort of generalized, aspirational statements that are insufficient definite to form a contract." *Fay School,* 931 F.3d at 12.

---

⁶ The deficiencies in Plaintiff's Complaint here involve more than just a failure of notice pleading. Plaintiffs here are seeking to leverage their alleged entitlement to "life-long prestige" to demand specific injunctive relief in the form of "termination of administrators, professors, faculty, and other employees" and "suspension or expulsion" of students. Were such a claim deemed actionable, it is not unimaginable that a second cohort of would-be alumni plaintiffs could bring suit on the same theory, but complaining instead that any such actions adversely violated *their* supposed "contractual right" to "life-long prestige" as Harvard graduates.

D.   **Plaintiffs Do Not Allege Consideration to Support Their Breach of Contract Claim**.

To be valid and enforceable in Massachusetts, a contract must also be supported by adequate consideration. *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016); *see also Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (quoting *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 142 (1st Cir. 1998)) ("in order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor"). Here, however, Plaintiffs do not allege that they provided *any* bargained-for benefit or suffered any bargained-for detriment in exchange for the implied contract they are now attempting to enforce against Harvard. For that additional reason, their breach of contract claim must be dismissed.

Taking a generous view of the Complaint, Plaintiffs' allegation that they have "an implied contractual relationship with Harvard by virtue of their enrollment at Harvard and graduation from Harvard's programs," *see* Complaint, Dkt. No. 1, ¶ 78, suggests an allegation that the tuition Plaintiffs paid to Harvard between 1973 and 1996 was furnished in exchange for certain undefined, lifelong, alumni-related benefits. But that past consideration—necessarily paid many years ago in connection with Plaintiffs' Harvard enrollment, education, and degrees—is insufficient to support their newly alleged implied contract. *Greater Bos. Cable Corp. v. White Mountain Cable Const. Corp.*, 414 Mass. 76, 80 (1992) ("Past consideration does not support a contract").

In *Annabi v. New York Univ.*, 2023 WL 6393422 (S.D.N.Y. Sept. 29, 2023), a federal district court rejected a similar implied contract claim due to lack of consideration. In that case, a graduate of New York University ("NYU") alleged that NYU had "breached an implied contract it had with him by selling him BS and MBA degrees 'that included a lifetime of alumni

14

benefits'" and then withdrawing those alumni benefits. *Id.* at \*6. In support of this claim, the plaintiff's complaint "highlight[ed] a section of the NYU website touting 'Alumni Benefits & Resources,' which state[d] that "alumni can explore entrepreneurship support," as well as several other statements from the NYU website that he claimed created an implied contract. *Id.*

In dismissing the plaintiff's claims for relief, the *Annabi* court concluded that the plaintiff had not alleged sufficient consideration to support his contract claim against NYU. *Id.* at \*8. The court noted that the plaintiff had graduated from NYU more than a decade earlier, and that he "would have paid tuition then." *Id.* Because "[t]he website promotions and statements to which he point[ed] were all made in the 2020 to 2021 time period," the plaintiff "could not have made the decision to enroll in exchange for those promises," and "[a]ny obligation he had to pay tuition and any tuition he paid pre-existed [NYU's] alleged promises." *Id.*

The *Annabi* court's reasoning is directly applicable here. Plaintiffs admittedly paid their tuition to Harvard decades ago. *See* Complaint, Dkt. No. 1, ¶¶ 19–30. The various Harvard and HAA website statements to which they point, *id.* ¶¶ 35, 76, are not alleged to have existed between 1973 and 1996—in fact, for most of that time, the World Wide Web itself did not exist. Plaintiffs do not allege—nor could they plausibly allege—that they made the decision to enroll at Harvard based on statements currently on the Harvard Alumni Association website. Accordingly, any consideration they may have paid to Harvard decades ago long predated the promises alleged in the Complaint. Because "[i]t is axiomatic that past consideration cannot support the formation of a new contract," Plaintiffs' breach of contract claim against Harvard must fail. *Annabi*, 2023 WL 6393422, at \*8 (quoting *Pennolino v. Cent. Prods. LLC*, 2023 WL 3383034, at \*15 (S.D.N.Y. May 11, 2023)); *Greater Bos. Cable Corp.*, 414 Mass. at 80.

**II.     Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Must Be Dismissed.**

Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract." *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 964 (2004). "The covenant may not, however, create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Id.* In other words, absent the existence of an enforceable contract, there is no covenant of good faith and fair dealing to be breached. *Thornton v. Harvard University*, 2 F. Supp. 2d 89, 95 (D. Mass. 1998) (finding that Harvard law school graduate who was unable to establish a claim for breach of contract arising out of Harvard's Low-Income Protection Program ("LIPP") program had no claim, either, for breach of the implied covenant of good faith and fair dealing).

Because Plaintiffs have not alleged that any valid contract exists between Harvard and Plaintiffs, *see supra* pp. 7–15, their claim for breach of the implied covenant of good faith and fair dealing must also be dismissed.

**III.    Plaintiffs Lack Standing to Pursue Their Claims Against Harvard.**

Finally, Plaintiffs' status as Harvard alumni does not confer upon them standing to assert any cause of action—contractual or otherwise—against Harvard in order to challenge Harvard's current, day-to-day operational decisions. Thus, while their two contractual claims necessarily fail on their face, *see supra* pp. 7–16, Plaintiffs should not be permitted to recast those claims as other civil claims designed to impose Plaintiffs' own views of Harvard's operational decisions upon the educational institution from which they have long-since graduated. Any request by Plaintiffs for leave to amend the Complaint should therefore be denied.

While no Massachusetts court appears to have yet reached the issue, federal and state courts throughout the country regularly hold that university alumni lack standing to assert claims challenging the operational decisions of their alma maters. *See, e.g., Ad Hoc Comm. of Baruch Black & Hisp. Alumni Ass'n v. Bernard M. Baruch Coll.*, 726 F. Supp. 522, 523 (S.D.N.Y. 1989) ("in the absence of any other factors, it is apparent that, upon graduation, one may no longer look to one's alma mater for other than such things as a transcript of grades as needed"); *accord Brown v. Texas A&M University School of Law*, 2016 WL 206465, at *3 (N.D. Tex. Jan. 14, 2016) ("alumni generally do not have the right to interfere with the administration of their alma mater"); *Leach v. Nichol*, 2007 WL 1574409, at *3 (E.D. Va. May 29, 2007) (concluding that alumnus lacked standing to challenge college's changes to its practices at campus chapel, because the fact that alumnus was "emotionally upset" about those changes did not constitute an "invasion of a legally protected interest"), *aff'd* 256 F. Appx. 612 (4th Cir. 2007); *Tishok v. Dep't. of Educ.*, 133 A.2d 118, 123 (Pa. Commw. Ct. 2016) ("An individual's status as a graduate of an educational institution does not give her standing to challenge changes in the educational institution's practices, structure or governance in court"); *Comm. to Save Polytechnic Univ. v. Bd. of Trustees of Polytechnic Univ.*, 2009 WL 222097, at *4 (N.Y. Sup. Ct. 2009) ("The donation of time, money and effort to an enterprise and investing pride in it simply are not enough to confer standing to sue. Likewise, the desire to see one's alma mater remain an autonomous educational institution does not itself represent a legally cognizable interest"); *Russell v. Yale University*, 737 A.2d 941, 944–46 (Conn. App. 1999) (divinity school alumni lacked standing to challenge reorganization of divinity school); *Corp. of Mercer Univ. v. Smith*, 371 S.E.2d 858, 861 & n.7 (Ga. 1988), *abrogated on other grounds by Warren v. Bd. of Regents of the Univ. Sys. of Georgia*,

527 S.E.2d 563 (Ga. 2000) (alumnae of women's college had no standing to challenge merger of college into coeducational university and closure of its campus).

To be sure, the "intensity of concern" that many alumni feel for their alma mater can be "real and commendable." *In re Milton Hershey School*, 911 A.2d 1258, 1263 (Pa. 2006). Plaintiffs may well share such intense concerns for Harvard. *See, e.g.*, Complaint, Dkt. No. 1, ¶¶ 4, 9, 18, 76, 78–79. But as the *Tishok* court succinctly explained, "the ties and devotion that alumn[i] feel for their alma mater are not the type of actual, direct interest necessary to confer standing." *Tishok*, 133 A.2d at 123. For that additional reason, the Plaintiffs' claims in this case should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Harvard respectfully requests that this Court enter an order dismissing Plaintiffs' Complaint with prejudice.

Respectfully submitted,

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,

/s/ *Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
dcloherty@clohertysteinberg.com
Victoria L. Steinberg (BBO #666482)
vsteinberg@clohertysteinberg.com
Alexandra Arnold (BBO #706208)
aarnold@clohertysteinberg.com
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
617-481-0160

Dated: May 13, 2024

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 13, 2024, this document was filed through the ECF system and will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing.

                                              /s/ *Daniel J. Cloherty*
                                              Daniel J. Cloherty