### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN JOSEPH BAUER; DOUGLAS S. RABIN; VIVIAN STEIR RABIN; RODDY TEEPLE; ANDREW NEFF; NANCY NEFF; RICHARD SANDERS POLIN; TAMMIE PUROW; MIMI JANKOVITS; and DAVID GENET,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION) and THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS,[1]<br><br>                    Defendants. | Civil Action No. 1:24-cv-10404-GAO |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

### Introduction

President and Fellows of Harvard College ("Harvard") condemns antisemitism, just as it condemns all forms of discrimination based on race, religion, national origin, or shared ancestry. Conduct that in any way targets Harvard's Jewish students, faculty, or staff for discrimination or harassment is unacceptable and antithetical to Harvard's core values. Since the horrific events of October 7, 2023, Harvard has undertaken efforts to protect its Jewish students and to make clear that antisemitism has no place at Harvard.

In this lawsuit, a collection of Harvard alumni who graduated between the early 1970s and the mid-1990s attempt to conscript this Court into service directing Harvard's ongoing battle against antisemitism. The Amended Complaint seeks a broad injunction ordering Harvard (1) to

---

[1] The Board of Overseers is not a proper defendant in this action, because it is not a corporate entity independent of President and Fellows of Harvard College.

"take disciplinary measures, including the termination of administrators, professors, faculty, and other employees responsible for antisemitic propaganda, discrimination, and harassment, whether because they engage in it or permit it," and (2) to take "disciplinary measures, including suspension or expulsion, of students who engage or have engaged in antisemitic conduct." Am. Compl., Request for Relief (Doc No. 23). Plaintiffs also seek "restitution" from Harvard for the alleged "devaluation of their Harvard degrees" caused by Harvard's supposed "failure to address its antisemitism problem." *Id.* ¶ 3. Advancing claims arising out of supposed implied contracts they have with Harvard, Plaintiffs contend that Harvard has breached a contractual obligation to uphold "a certain standard of higher education and reputability," *id.* ¶¶ 105, 110, and that, because of Harvard's conduct, Plaintiffs are no longer able to enjoy what they describe as "the life-long prestige of having graduated from Harvard," *id.* ¶ 105. Plaintiffs further contend that Harvard misrepresented "its diversity, equity and inclusion policies throughout the years," *id.* ¶ 116, and "its Gift Policy indicating it would promote academic freedom and different points of view and respect the rights, differences, and dignity of individuals," thereby inducing Plaintiffs to attend and donate to Harvard, *id.* ¶ 120. Finally, Plaintiffs contend that Harvard has been "unjustly enriched" by Plaintiffs' tuition payments and alumni donations, *id.* ¶ 122, and that Harvard violated an alleged fiduciary duty owed to Plaintiffs based on those donations, *id.* ¶¶ 127–28.

As explained below, Plaintiffs' various claims in the Amended Complaint against Harvard are meritless. *First and foremost*, Plaintiffs lack standing to assert any of their claims challenging Harvard's operational decisions or use of its charitable assets. *Second*, Plaintiffs fail to identify any enforceable contract that exists between them and Harvard. *Third*, their fraud and misrepresentation claims fail to identify with particularity any actionable fraud by Harvard. *Fourth*, their unjust enrichment and breach of fiduciary duty claims fail to state cognizable

claims for relief. *Finally,* even if they were colorable (and they are not), Plaintiffs' claims are necessarily barred by the applicable statutes of limitations.

The myriad accusations leveled against Harvard throughout Plaintiffs' Amended Complaint are wholly without merit, and many of the supposed "facts" that Plaintiffs allege are inaccurate and misleading. Harvard's disagreements with Plaintiffs' allegations, however, are not the subject of this Memorandum, because the Amended Complaint contains legal deficiencies that preclude its progress beyond the motion to dismiss stage. Accordingly, for all the reasons set forth below, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND[2]

Plaintiffs are ten Harvard University graduates who received various degrees from Harvard between 1973 and 1996. *See* Am. Compl. ¶¶ 22–32. In the Amended Complaint, Plaintiffs allege that although Harvard "was antisemitic in its admission policies" "in the first half of the twentieth century," it has "attempted to rehabilitate its antisemitic stance by instituting policies of tolerance, diversity, equity and inclusion over the past 60 or so years." *Id.* ¶ 38. They allege that beginning in the 1960s and continuing throughout the 1990s, Harvard undertook efforts to promote "a more inclusive campus environment" through a number of initiatives. *Id.* at ¶¶ 39–45. Nevertheless, Plaintiffs contend that since the 1920s, but especially over the last decade, Harvard has "foster[ed] and permit[ed] antisemitism" on its campus. *Id.* ¶¶ 50–68. They further allege that since the horrific events of October 7, 2023, Harvard has tolerated antisemitism on campus. *See id.* ¶¶ 69–94.

According to the Amended Complaint, due to Harvard's alleged actions and inactions since October 7, 2023, several employers have expressed their intention to no longer hire

---

[2] Harvard recounts the allegations as pleaded in the Amended Complaint for the limited purpose of its Motion to Dismiss.

Harvard graduates and have rescinded offers of employment to Harvard students. *Id.* ¶¶ 95–97. Harvard has also allegedly been "ridiculed publicly" and "shunned" by the professional world, including through the publication of various satirical cartoons. *Id.* ¶¶ 98–99.

The Amended Complaint acknowledges that colleges and universities across the country have been grappling with a rise in antisemitism on campus. *Id.* ¶ 101. Although this is a widespread problem, the Amended Complaint alleges that unspecified "[p]eople" have "explained that . . . Harvard 'ought to be' better," particularly "given its persistent ranking among the top three universities in the United States for an undergraduate degree and among the top five for a law degree or MBA." *Id.* According to Plaintiffs, these rankings require Harvard to adhere to an indeterminate "higher standard than other universities." *Id.*

In Count I of the Amended Complaint, Plaintiffs allege that, as Harvard alumni, they have "an implied contractual relationship" with their alma mater "by virtue of their enrollment at Harvard and graduation from Harvard's programs." *Id.* ¶ 104. The terms of this implied contract are allegedly found in unspecified "handbooks, regulations, codes, policies, and procedures promulgated by Harvard." *Id.* Plaintiffs also point to the Harvard Alumni Association website, which allegedly states that (1) "the relationship between Harvard and its graduates is 'a lifelong journey with countless avenues to explore"; (2) "Harvard is here for you during every stage in your career"; and (3) "[a]s a Harvard alumnus/a, you are entitled to benefits and services from across the University." *Id.* ¶ 101. Plaintiffs contend that their tuition payments for degrees awarded between 1973 and 1996 constitute consideration for the implied contract, particularly where Plaintiffs "paid a premium to attend Harvard and forewent attendance at other universities which have not permitted and are not permitting antisemitism to thrive on their campuses." *Id.* ¶ 104. According to Plaintiffs, pursuant to this implied contract, Harvard has agreed to "uphold a certain standard of higher education and reputability," such that all alumni may "enjoy the life-

long prestige of having graduated from Harvard." *Id.* ¶ 105. They then assert that Harvard has breached this implied contract "by failing to adequately address antisemitism on its campus." *Id.* ¶ 106. Plaintiffs further contend that this alleged breach has "caused the value and prestige of Plaintiffs' Harvard degrees to be diminished" and has "made a mockery out of Harvard graduates in the employment world and beyond." *Id.*

Count I also alleges a separate implied contractual relationship between Plaintiffs and Harvard "by virtue of their donations made to Harvard as alumni." *Id.* ¶ 108. According to Plaintiffs, the gift policy on Harvard's alumni website (the "Gift Policy") stresses "a fundamental and enduring commitment to academic freedom" and a "commit[ment] to respecting the rights, differences, and dignity of individuals." *Id.* at ¶¶ 47, 108. Plaintiffs contend that "when [they] made alumni donations to Harvard, they reasonably relied on the assumption that their donations would be used in an equitable and inclusive manner and not to promote policies that would specifically exclude Jewish students." *Id.* at ¶ 108. They then allege that Harvard breached this implied contract by "utilizing donations in contravention of its diversity, equity and inclusion policies as well as its Gift Policy," resulting in harm to Plaintiffs, who contend that they have been emotionally harmed by Harvard's supposed "misuse of their funds." *Id.*

In Count II, Plaintiffs contend that these alleged implied contracts with Harvard include an implied covenant of good faith and fair dealing. *Id.* at ¶¶ 110–12. As to the alleged implied contract based on Plaintiffs' enrollment at and graduation from Harvard, Plaintiffs contend that the implied covenant obligates Harvard (1) to "act in good faith to uphold the values and morals that historically made it an elite institution and eliminate, or at least, not condone antisemitism"; (2) to "uphold a certain standard of higher education and reputability"; and (3) to "not condone antisemitism and harassment." *Id.* ¶ 110. Plaintiffs allege that Harvard's failure to "adequately address antisemitism on its campus" constitutes a breach of this implied covenant. *Id.* ¶ 111.

With respect to the alleged implied contract based on Plaintiffs' alumni donations, Plaintiffs allege that the implied covenant requires Harvard to "act in good faith to uphold the values stated in its Gift Policy" by "promoting academic freedom and different points of view, and adhering to the institutional values of respecting the rights, differences, and dignity of individuals and demonstrating honesty and fair play in all dealings." *Id.* ¶ 112. They contend that Harvard also breached this obligation "by condoning antisemitism on its campus." *Id.*

In what is styled as combined "Counts III & IV," Plaintiffs assert claims for what they describe as "Fraud and Misrepresentation under Common Law and Massachusetts General Business Law." *Id.* ¶¶ 114–20. Here, Plaintiffs allege that Harvard "has misrepresented its diversity, equity and inclusion policies" by "allowing antisemitism to exist on campus." *Id.* ¶¶ 116–17. They contend that they "would not have applied for admission to Harvard or agreed to pay the tuition" if they had known "that Harvard's equity and diversity policies did not include Jewish students like the Plaintiffs." *Id.* ¶ 119. Plaintiffs further allege that Harvard misrepresented how alumni donations would be used and that they would not have made any donations to Harvard had they known that "their donations were being used to fund antisemitism." *Id.* ¶ 120.

In Count V, Plaintiffs contend that Harvard has been "unjustly enriched by receiving tuition payments at a premium and alumni donations" and that Plaintiffs "have suffered a loss and detriment because they donated to an antisemitic university, contrary to the Plaintiffs' values and intentions." *Id.* ¶¶ 122–24.

In Count VI, Plaintiffs allege that Harvard owed them a fiduciary duty arising out of their alumni donations to the university. *Id.* ¶ 127. They contend that Harvard breached this duty "because Plaintiffs donated to Harvard with an implicit trust that Harvard would adhere to basic

ethical standards, including not supporting antisemitism," and Harvard "unethically utilize[ed]

their donations to support an antisemitic campus environment." *Id.* ¶ 128.

## STANDARDS OF REVIEW

A motion to dismiss based on a lack of standing arises under Rule 12(b)(1) of the Federal

Rules of Civil Procedure. *Blum v. Holder*, 744 F.3d 790, 795–96 (1st Cir. 2014). "'The party

invoking federal jurisdiction bears the burden of establishing' standing." *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 412 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992)). To show standing, the plaintiff must "'allege[] such a personal stake in the outcome of

the controversy' as to warrant [their] invocation of federal jurisdiction and to justify exercise of

the court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)

(quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "[W]hen a plaintiff seeks prospective relief

such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Food &*

*Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). In assessing plausibility, the court does not credit "mere conclusory statements" or

"'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

Rule 9(b) imposes additional pleading requirements on allegations sounding in fraud.

Fed. R. Civ. P. 9(b). Under that rule, a party must state "with particularity the circumstances

constituting fraud or mistake." *Id.* This requires that a plaintiff specifically plead the time, place,

and content of the alleged false representation. *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17,

22 (1st Cir. 2017). In addition, the plaintiff must identify "the basis for inferring scienter." *N. Am.*

*Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). In

application, this renders a "general averment of the defendant's 'knowledge' of material falsity" insufficient. *Id.* (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992), *superseded on other grounds by* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737). Instead, a plaintiff must put forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Id.*

## **ARGUMENT**

I.   **Plaintiffs' Alleged Status as Harvard Alumni Does Not Give Them Standing to Pursue the Claims in the Amended Complaint.**

As a threshold matter, all the claims in the Amended Complaint against Harvard should be dismissed for lack of standing. Standing is an "essential and unchanging" component of Article III's case-or-controversy requirement. *See Food & Drug Admin.*, 602 U.S. at 380 (citing *Lujan*, 504 U.S. at 560). It consists of three well-settled requirements: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) redressability by a favorable decision. *See Lujan*, 504 U.S. at 560–61. Plaintiffs' claim plainly fail to satisfy these requirements.

Specifically, Plaintiffs have not shown—nor can they possibly show—that, as Harvard alumni, they have suffered a "concrete and particularized" injury due to Harvard's alleged conduct. Plaintiffs admittedly graduated decades before the events they claim to be at issue in this case. *See* Am. Compl. ¶¶ 23–32. They do not currently attend Harvard, nor are they currently employed by Harvard. *Id.* In short, they are not directly affected by Harvard's current operational decisions in any way. Their claims of injury arising from Harvard's alleged misconduct are accordingly not cognizable in this or any other court of law.

Notably, federal and state courts across the country have consistently concluded that alumni generally lack standing to challenge the administrative decisions and policies of their

alma maters. *See e.g.*, *Leach v. Nichol*, 2007 WL 1574409, at *3 (E.D. Va. May 29, 2007)

(alumnus lacked standing to challenge college's change in practices concerning its chapel

because fact that he was "emotionally upset" about those changed practices did not constitute an

"invasion of a legally protected interest"), *aff'd*, 256 F. App'x 612 (4th Cir. 2007); *Mercer Univ.*

*v. Smith*, 371 S.E.2d 858, 861 (Ga. 1988) (alumnae of women's college lacked standing to

challenge merger of college into coeducational university and closure of its campus), *abrogated*

*on other grounds by Warren v. Bd. of Regents*, 527 S.E.2d 563 (Ga. 2000); *see also Tishok v.*

*Dep't. of Educ.*, 113 A.2d 118, 123 (Pa. Commw. Ct. 2016) (alumnae and former trustees of

women's college lacked standing to challenge coeducation); *Russell v. Yale Univ.*, 737 A.2d 941,

944–46 (Conn. App. 1999) (divinity school alumni lacked standing to challenge reorganization

of divinity school); *Comm. to Save Polytechnic Univ. v. Bd. of Trustees of Polytechnic Univ.* 2009

WL 222097, at *5 (N.Y. Sup. Ct. Jan. 30, 2009) (university alumni lacked standing to challenge

state's approval of changes to university's charter to permit merger or consolidation into other

university); *Steeneck v. Univ. of Bridgeport*, 1994 WL 463629, at *7 (Conn. Super. Ct. Aug. 18,

1994), *aff'd*, 668 A.2d 688 (Conn. 1995) (university alumni lacked standing to challenge

university's entry into loan agreement that gave other nonprofit corporation right to select 60%

of university's trustees); *accord Brown v. Texas A&M Univ. Sch. of Law*, 2016 WL 206465, at *3

(N.D. Tex. Jan. 14, 2016) ("alumni generally do not have the right to interfere with the

administration of their alma mater"); *Ad Hoc Comm. of Baruch Black & Hisp. Alumni Ass'n v.*

*Bernard M. Baruch Coll.*, 726 F. Supp. 522, 523 (S.D.N.Y. 1989) ("in the absence of any other

factors, it is apparent that, upon graduation, one may no longer look to one's alma mater for

other than such things as a transcript of grades as needed"). As these cases make clear, university

alumni lack standing to challenge their alma maters' operations precisely because they "lack a

concrete interest in those administrative practices." *Ad Hoc Comm.*, 726 F. Supp. at 525 n.4.

Indeed, as these decisions indicate, although alumni may have an "intensity of concern" for their alma maters that is "real and commendable," such concern "is not a substitute for an actual interest" sufficient to confer standing. *In re Milton Hershey Sch.*, 911 A.2d 1258, 1263 (Pa. 2006); *see also Tishok*, 133 A.2d at 123 ("the ties and devotion that alumn[i] feel for their alma mater are not the type of actual, direct interest necessary to confer standing"). Nor do Plaintiffs' vague allegations regarding the alleged "devaluation" of their degrees help their argument. "[T]he plaintiff alumni have already received their degrees, and the injuries they have allegedly suffered due to [the university's] alleged loss of academic reputation fall within the 'impermissible realm of general speculation about unproven hypothetical situations.'" *Steeneck*, 1994 WL 463629, at *6 (quoting *Maloney v. Pac*, 439 A.2d 349, 354 (Conn. 1981)).

Accordingly, to the extent that Plaintiffs seek to invoke their status as Harvard alumni to challenge Harvard's various administrative decisions and policies, those claims must be dismissed for lack of standing. *See Brown* 2016 WL 206465, at *3; *Ad Hoc Comm.*, 726 F. Supp. at 523; *Leach*, 2007 WL 1574409, at *3; *In re Milton Hershey Sch.*, 911 A.2d at 1263; *Mercer Univ.*, 371 S.E.2d at 861; *Tishok*, 113 A.2d at 123; *Russell*, 737 A.2d at 944–46; *Comm. to Save Polytechnic*, 2009 WL 222097, at *5; *Steeneck*, 1994 WL 463629, at *7.

## II.     Plaintiffs' Alleged Status as Prior Donors to Harvard Does Not Create Standing.

Nor does Plaintiffs' alleged status as prior donors to Harvard confer them with standing to challenge the use of Harvard's charitable funds. As an initial matter, Plaintiffs have not alleged facts sufficient to establish that they were in fact donors to Harvard. The Amended Complaint contains no information regarding the dates, amounts, or circumstances surrounding those supposed donations. Instead, the Amended Complaint refers broadly to alleged "donations," *see* Am. Compl. ¶¶ 3, 11, 12–14, 108, 120, 123, 128, but does not connect any particular donations to any particular Plaintiff, *see id.* ¶¶ 23–32 (referencing each Plaintiff's connection to Harvard

without any reference to any donations made by any Plaintiff); *see also id.* ¶¶ 120 (apparently speculating about "any donations to Harvard" that Plaintiffs may have made); 122 (referring generally to "alumni donations").

Regardless, even if some or all of the Plaintiffs previously donated to Harvard, that would be insufficient to confer standing. There is no dispute that Harvard is an educational, charitable corporation under Massachusetts law. *See e.g.*, *Harvard Climate Just. Coal. v. President & Fellows of Harvard Coll.*, 90 Mass. App. Ct. 444, 445 n.4 (2016) (referring to President and Fellows of Harvard as "charitable corporation"). Under Massachusetts law, private parties— including donors—lack standing to challenge the way in which a charitable institution manages or uses its money; such standing lies exclusively with the Attorney General. *See* Mass. Gen. Laws ch. 12, § 8; *Weaver v. Wood*, 425 Mass. 270, 275 (1997) ("We consistently have held that only the Attorney General can bring an action alleging the misuse of charitable assets"). Indeed, Massachusetts courts have consistently rejected similar efforts by donors seeking to challenge Harvard's operational decisions. *See Harvard Climate Just. Coal.*, 90 Mass. App. Ct. at 447 (quoting *Weaver*, 425 Mass. at 277) ("membership in a public charity, alone, is [in]sufficient to give standing to pursue claims that a charitable organization has been mismanaged or that its officials have acted ultra vires"); *see also Harvard Prison Divestment Campaign v. President and Fellows of Harvard Coll*, 2081CV00510, at *7 (Mass. Super. Ct. Jan. 7, 2021) (unpublished) (attached hereto as Exhibit A) (concluding that plaintiffs' donations to Harvard did not create standing to challenge Harvard's management of its charitable funds); *Ames v. Att'y Gen.*, 332 Mass. 246, 250 (1955) (holding that donors to Harvard lacked standing to challenge Harvard's decision to relocate arboretum); *accord Garland v. Beverly Hosp. Corp.*, 48 Mass. App. Ct. 913,

914 (1999) (plaintiff's status as donor to hospital did not "confer[] upon him an interest in the [hospital] sufficiently distinct from that of the general public to grant him standing").[3]

Despite this well-settled law, Plaintiffs assert a hodgepodge of claims that sound, variably, in contract, quasi-contract, and tort but that all share the same leitmotif: that Plaintiffs' alleged status as donors to Harvard somehow grants them the right to challenge what they describe as alleged "misuse by Harvard" of those donations. Am. Compl. ¶ 11; *see also id.* ¶¶ 108, 112, 120, 124, 127–29. But that simply is not the law. In a similar case, the Massachusetts Superior Court considered whether a group of Harvard donors could enjoin Harvard's investments in private prisons by dint of their donor status. *See Harvard Prison Divestment Campaign*, 2081CV00510, at *6. In dismissing the complaint for lack of standing, the Superior Court explained that if such a right existed, "it would render meaningless the exclusive standing of the Attorney General to enforce due application of charitable funds and also would obligate Harvard to follow the unexpressed intent of all donors, which is an unworkable principle." *Id.* at *7.

Massachusetts law compels the same result here: Plaintiffs cannot invoke their alleged status as Harvard donors in order to end-run the Attorney General's exclusive statutory enforcement powers under Mass. Gen. Laws ch. 12, § 8. *See Weaver*, 425 Mass. at 275; *Ames*, 332 Mass. at 250–51. For that additional reason, the Amended Complaint should be dismissed.

---

[3] A narrow exception to this rule—the so-called "special standing doctrine"—grants standing to litigants who can establish that they possess a beneficial interest in the public charity that is separate and distinct from that of the general public. *See Maffei v. Roman Cath. Archbishop of Boston*, 449 Mass. 235, 245 (2007). But in establishing that narrow exception, the Supreme Judicial Court was careful to distinguish donors with such specific interests from the more "general class" of donors. *Id.* Where, as here, Plaintiffs have not alleged "that they sought or that Harvard agreed to any restrictions on their donations, particularly any donation that would confer a special interest upon them . . . that would be distinct from any other donor," *Harvard Prison Divestment Campaign*, 2081CV00510, at *7, they have not established any such specific interest.

III.     **Plaintiffs' Breach-of-Contract Claim Must Be Dismissed.**

Of course, even if Plaintiffs could establish standing here (and they cannot), their claims would still fail. First, the Amended Complaint fails to state a claim for breach of contract because it (1) fails to allege sufficient facts to support the existence of any contract between Plaintiffs and Harvard, (2) fails to allege contract terms that are sufficiently definite to be enforceable, and (3) fails to allege adequate consideration to support a contract with Harvard. Each of these reasons is, alone, sufficient to support dismissal of Plaintiffs' breach-of-contract claim.

A.     ***The Amended Complaint Does Not Allege Sufficient Facts to Support the Existence of a Contract Between Plaintiffs and Harvard.***

A plaintiff seeking recovery on a breach-of-contract claim bears the burden of proving the existence of a contract. *Carney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967). Here, Plaintiffs' primary contract claim is premised on their assertion that they "have an implied contractual relationship with Harvard by virtue of their enrollment at Harvard and graduation from Harvard's programs." Am. Compl. ¶ 104. But Plaintiffs' mere status as Harvard graduates does not create the type of contractual relationship that Plaintiffs allege.

To the contrary, courts have routinely refused to recognize claims by alumni seeking to assert ill-defined breach-of-contract claims against their alma maters. *See Shaw Alumni and Friends, Inc. v. Bell*, 2016 WL 3080792, at *3 (E.D.N.C. May 31, 2016) (finding that plaintiffs had not plausibly alleged that chairmen of University Board of Trustees had "[c]ontract with each student, faculty member, and alumnus of the University to protect . . . the value of their degrees")[4]; *Young v. Boston Univ.*, 64 Mass. App. Ct. 586, 589 (2005) (explaining that brochure provided to university graduate describing various alumni benefits "did not constitute a contract"

---

[4] The *Shaw* court found that the plaintiffs' allegation that such a contract existed was so "ludicrous" that it issued an order to show cause why it should not impose sanctions pursuant to Fed. R. Civ. P. 11. *Shaw*, 2016 WL 3080792, at *3.

between university and its alumnus); *see also Annabi v. New York Univ.*, 2023 WL 6393422, at *9 (S.D.N.Y. Sept. 29, 2023) (dismissing breach-of-contract claim brought by alumnus against university seeking to enforce alleged "eligibility" for "alumni benefits"); *Cheves v. Trustees of Columbia Univ.*, 89 A.D.3d 463, 464 (N.Y. App. Div. 2011) (explaining that allegations regarding alumni relations brochure that listed "certain benefits and services generally available to alumni" were insufficient to support breach-of-contract claim by alumnus). In rejecting these putative contract claims, courts have recognized that the relationship between an educational institution and its alumni is markedly different from any quasi-contractual relationship that may exist between such institutions and their current students. *See, e.g.*, *Jenkins v. Howard Univ.*, 2023 WL 3948815, at *5 (D.D.C. Jun. 12, 2023) (explaining that while relationship between university and its students may, at times, be "contractual in nature," the "relationship between [university] and its *former* students" presents a "more attenuated situation") (original emphasis) (quotations and citations omitted).

In an effort to bolster their breach-of-contract claim, Plaintiffs try to extract an alleged "student-university contract" from various "handbooks, regulations, codes, policies and procedures promulgated by Harvard." *See* Am. Compl. ¶ 104. To be sure, Massachusetts courts have long recognized that the relationship between educational institutions and their current students can be "contractual in nature," *see Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 316–17 (1st Cir. 2022); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000); *see also Dinu v. President and Fellows of Harvard Coll.*, 56 F. Supp. 2d 129, 130 (D. Mass. 1999) ("That the relationship between a university and its students has a strong, albeit flexible, contractual flavor is an idea pretty well accepted in modern case law"), and that the terms governing this student-university quasi-contractual relationship can be informed by "statements in handbooks, policy manuals,

brochures, catalogues, advertisements and other promotional materials," *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997).[5]

But Plaintiffs admittedly are *not* students at Harvard, *see* Am. Compl. ¶¶ 22–32, and *nothing* in Massachusetts or First Circuit case law remotely suggests that a similarly "unique" contractual-type relationship exists between educational institutions and their alumni. *Guckenberger*, 974 F. Supp. at 150. Rather, the one Massachusetts court that has specifically considered a generalized breach-of-contract claim by a university graduate against his alma mater has expressly rejected it. *See Young*, 64 Mass. App. at 589. For that reason alone, Plaintiffs' breach-of-contract claim should be dismissed.

**B.    *The Implied Contract Alleged in the Complaint Is Insufficiently Definite.***

Moreover, even if some graduates of educational institutions *could* assert certain contract claims against their alma maters, Plaintiffs have not done so here. For a contract to be enforceable in Massachusetts, "[a]ll the essential terms of the contract must be sufficiently definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." *Moore v. La-z-Boy, Inc.*, 639 F. Supp. 2d 136, 139 (D. Mass. 2009) (quoting *Cygan v. Megathlin*, 326 Mass. 732, 733–34 (1951)). Whether the terms of a purported contract are sufficiently definite to be enforceable is a question of law for the court. *See Conway v. Licata*, 104 F. Supp. 3d 104, 114 (D. Mass. 2015).

Here, beyond offering generalized allegations regarding Plaintiffs' "enrollment and graduation from Harvard's programs," *see* Am. Compl. ¶ 104, the Amended Complaint fails to describe with any specificity how the supposed implied contract between Plaintiffs and Harvard was ever formed, much less its terms.

---

[5] Tellingly, Plaintiffs do not identify *any* handbook, regulation, code, policy, or procedure that sets forth protections for or obligations to alumni relating to the subject of the Amended Complaint.

The First Circuit's decision in *Squeri v. Mount Ida College*, 954 F.3d 56, 71 (1st Cir. 2020) is instructive here. There, the First Circuit affirmed the district court's dismissal of a breach-of-contract claim brought by several students against a college that had abruptly shut down. *Id*. The court explained that the mere allegations that the plaintiffs had enrolled at the college and that "a contract was formed" did not adequately describe "the terms of any such contract or that specific terms required earlier disclosure of the closing." *Id.* The First Circuit accordingly concluded that "there was insufficient specificity" to support the claim. *Id.* at 72.[6]

So too here. Like the *Squeri* plaintiffs, Plaintiffs in this case have based their implied contract claim on allegations that invoke little more than their prior enrollment at the educational institution with which they allegedly contracted. Am. Compl. ¶ 104. Nowhere do Plaintiffs allege the precise terms of that supposed contract, much less the steps that Harvard was allegedly obliged to take to comply with those alleged terms. So, just as in *Squeri*, Plaintiffs' contract claim should be dismissed for "insufficient specificity." *Squeri*, 954 F.3d at 72.

To the extent that any purported contractual terms *are* alleged in the Amended Complaint, they are too vague and indefinite to be actionable. Plaintiffs' allegation that Harvard "impliedly committed and agreed to uphold a certain standard of higher education and reputability such that Plaintiffs would enjoy the life-long prestige of having graduated from Harvard," Am. Compl. ¶ 105, is precisely the type of alleged contractual term that Massachusetts courts have regularly rejected as unenforceable. *See G. v. Fay School*, 931 F.3d 1, 12–13 (1st Cir. 2019) (quoting *Shin v. Mass. Inst. of Tech.*, 2005 WL 1869101, at *7 (Mass. Super. Ct. Jun. 27, 2005)) (explaining difference between "well defined procedures and policies, which can form

---

[6] In reaching this conclusion, the court explained that plaintiffs asserting breach-of-contract claims under Massachusetts law must "state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof." *Squeri*, 954 F.3d at 71 (quoting *Tel. Answering Serv. of Boston, Inc. v. New England Tel. & Tel. Co.*, 358 Mass 822 (1971) (internal citations omitted).

contractual promises," and "'generalized representations,' which cannot"). Indeed,

Massachusetts courts have been careful to distinguish specific, potentially enforceable promises

made by educational institutions to their students from other "aspirational statements" that are

not enforceable as a matter of law. *See Fay School*, 931 F.3d at 12 (statements such as "[m]utual

respect and civility are a central aspect of healthy communities" and "[w]e expect all members of

the community to respect the rights of others and to behave appropriately at all times" were

insufficient to form contract); *Wu v. Ma,* 2023 WL 6318831, at *1 (D. Mass. Sept. 28, 2023)

(college's commitment "to offering students a nurturing, collaborative, and positive learning

environment encouraging the active exchange of ideas, deep reflection and sound decision

making" was insufficiently definite to form enforceable contract); *Brown v. Suffolk Univ.*, 2021

WL 2785047, at *6 (D. Mass. Mar. 31, 2021) (statement that law school's disability services

"serves as a valuable resource for students with disabilities . . . to promote an understanding and

awareness of accessibility issues . . . in order to provide a supportive and engaging setting for our

students" was too indefinite to create contractual obligations); *Shin*, 2005 WL 1869101, at *7

(statements by university that "care givers also will help you maintain good health," that "[w]e

want to help you maintain your physical, psychological and emotional well-being," and that

department "has the responsibility to provide high quality, low barrier comprehensive health

services to the MIT Community" did not create enforceable contractual obligations); *cf.*

*Czerwienski v. Harvard University*, 666 F. Supp. 3d 49, 100–01 (D. Mass. 2023) (explaining

distinction between generalized aspirational statements and procedural promises that are

sufficiently specific to be enforceable).

      Plaintiffs' core contractual allegation in this case—that Harvard has agreed to "uphold a

certain standard of higher education and reputability" so that Plaintiffs could enjoy "the life-long

prestige of having graduated from Harvard"—is plainly too indefinite to support a binding

contract. Plaintiffs point to no definition of that "certain standard of higher education" that could plausibly be enforced by this Court. And the Amended Complaint fails to describe with any reasonable specificity an enforceable definition of the "life-long prestige" that Harvard has allegedly agreed to provide to Plaintiffs.[7] *See Fay School*, 931 F.3d at 12–13.

Nor is Plaintiffs' breach-of-contract claim helped by their references to statements on the Harvard and Harvard Alumni Association ("HAA") websites. *See* Am. Compl. ¶¶ 101, 110. The Harvard website's "diversity and inclusion" statement allegedly states that "[w]e all belong here" and that "[t]ogether, we strive to create an environment that values diversity, promotes an inclusive culture, and establishes a profound sense of belonging for each member of our community"). *Id.* ¶ 102. The HAA website allegedly states that "Harvard is a lifelong journey with countless avenues to explore," that "Harvard is here for you during every stage in your career," and that "[a]s a Harvard alumnus/a, you are entitled to benefits and services from across the University." *Id.* ¶ 101. These statements, like Harvard's a promise to "uphold a certain standard of higher education and reputability," are just too indefinite and aspirational to support a breach-of-contract claim. "Without diminishing the importance of these words, they are exactly the sort of generalized, aspirational statements that are insufficient definite to form a contract." *Fay School,* 931 F.3d at 12. Plaintiffs' tuition-based breach-of-contract claim must therefore be dismissed.

---

[7] This is more than just a failure of notice pleading. Plaintiffs are seeking to leverage their alleged entitlement to "life-long prestige" to demand specific injunctive relief in the form of "termination of administrators, professors, faculty, and other employees" and "suspension or expulsion" of students. Am. Compl. p. 36. Were such a claim deemed actionable, it is not unimaginable that a second cohort of would-be alumni plaintiffs could bring suit on the same theory but could complain instead that any such actions adversely violated their supposed "contractual right" to "life-long prestige" as Harvard graduates.

**C.      *Plaintiffs Do Not Allege Adequate Consideration.***

To be valid and enforceable in Massachusetts, a contract must also be supported by adequate consideration. *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016); *see also Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (quoting *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 142 (1st Cir. 1998)) ("for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor").

Here, Plaintiffs allege that their "tuition payments to Harvard," made between the late 1960s and the mid-1990s, were furnished in exchange for certain undefined, lifelong alumni-related benefits. Am. Compl. ¶ 104. They also claim that they "paid a premium to attend Harvard and forewent attendance at other universities." *Id.* But that past consideration—necessarily paid many years ago in connection with their Harvard enrollment and education—is insufficient to support their newly alleged implied contract. *Greater Bos. Cable Corp. v. White Mountain Cable Const. Corp.*, 414 Mass. 76, 80 (1992) ("Past consideration does not support a contract").

In *Annabi v. New York Univ.*, 2023 WL 6393422, at *8, a federal district court rejected a similar implied contract due to lack of consideration. In that case, a graduate of New York University ("NYU") alleged that NYU had "breached an implied contract it had with him by selling him BS and MBA degrees 'that included a lifetime of alumni benefits'" and then withdrawing those alumni benefits. *Id.* at *6. In support of this claim, the plaintiff's complaint "highlight[ed] a section of the NYU website touting 'Alumni Benefits & Resources,' which state[d] that "alumni can explore entrepreneurship support," as well as several other statements from the NYU website that he claimed created an implied contract. *Id.*

In dismissing the complaint, the *Annabi* court concluded that the plaintiff had not alleged sufficient consideration to support his contract claim against NYU. *Id.* at *8. The court noted that

the plaintiff had graduated from NYU more than a decade earlier and that he "would have paid tuition then." *Id.* Because "[t]he website promotions and statements to which he point[ed] were all made in the 2020 to 2021 time period," the plaintiff "could not have made the decision to enroll in exchange for those promises," and "[a]ny obligation he had to pay tuition and any tuition he paid pre-existed [NYU's] alleged promises." *Id.*

The *Annabi* court's reasoning is directly applicable here. Plaintiffs admittedly paid their tuition to Harvard decades ago. *See* Am. Compl. ¶¶ 22–32. The various Harvard and HAA website statements to which they point are not alleged to have existed between 1973 and 1996. And although Plaintiffs suggest that Harvard's "mission when Plaintiffs attended," *id.* ¶ 102, was the same, they do not plausibly allege that they made the decision to enroll at Harvard based on statements currently on the Harvard Alumni Association website or other unspecified mission statements. Accordingly, any consideration they may have paid to Harvard long predated the promises alleged in the Amended Complaint. Because "[i]t is axiomatic that past consideration cannot support the formation of a new contract," Plaintiffs' breach-of-contract claim against Harvard must fail. *Annabi*, at *8 (quoting *Pennolino v. Cent. Prods. LLC*, 2023 WL 3383034, at *15 (S.D.N.Y. May 11, 2023)); *see also Greater Bos. Cable Corp.*, 414 Mass. at 80.

### D.     *Plaintiffs' Donation-Based Breach of Contract Claim is Invalid.*

Nor can Plaintiffs' breach-of-contract claim be salvaged by their allegation that they have an implied contractual relationship with Harvard "by virtue of their donations made to Harvard as alumni." Am. Compl. ¶ 108. As discussed previously, *see supra* pp. 10–12, courts in the Commonwealth have consistently refused to permit such claims, as doing so would intrude on the exclusive authority of the Attorney General to protect public charitable trusts and to enforce proper application of their funds. Mass. Gen. Laws ch. 12, § 8.

Additionally, to the extent that this alleged implied contract is based on a statement in the Gift Policy that Harvard will administer gifts to "promot[e] academic freedom and different points of view, and adher[e] to the institutional values of respecting the rights, differences, and dignity of individuals and demonstrating honesty and fair play in all dealings," *see* Am. Compl. ¶ 108, it suffers from the same indefiniteness that dooms Plaintiffs' tuition-based theory. Indeed, reasonable minds may—and often do—strongly disagree about what Harvard must do to uphold academic freedom and adhere to institutional values. Allowing such a nebulous claim to proceed would permit any donor aggrieved by Harvard's policies to bring a claim for breach of contract. Because the law requires more, *see Fay School*, 931 F.3d at 12–13, this claim cannot survive.

## IV.   Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law.

Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract." *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 964 (2004). "The covenant may not, however, create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Id.* In other words, absent the existence of an enforceable contract, there is no covenant of good faith and fair dealing to be breached. *Thornton v. Harvard University*, 2 F. Supp.2d 89, 95 (D. Mass. 1998) (finding that Harvard Law School graduate who was unable to establish a claim for breach of contract arising out of Harvard's Low-Income Protection Program had no claim for breach of the implied covenant of good faith and fair dealing).

Because Plaintiffs have not alleged that any valid contract exists between Harvard and Plaintiffs, *see supra* pp. 13–21, their claim for breach of the implied covenant of good faith and fair dealing must also be dismissed.

## V.   **Plaintiffs' Fraud and Misrepresentation Claims Must Be Dismissed.**

In the Amended Complaint, Plaintiffs assert combined "Fraud and Misrepresentation" claims that purport to arise under both "Common Law" and "Massachusetts General Business Law." *See* Am. Compl. ¶¶ 114–20. As an initial matter, Plaintiffs' effort to assert these combined claims fails to satisfy the basic pleading requirements that a claim for relief contain "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and that each averment be "simple, concise and direct," Fed. R. Civ. P. 8(d)(1). Here, nothing in the Plaintiffs' combined Counts III & IV explains what "Massachusetts General Business Law" Harvard has supposedly violated. For that reason alone, these claims should be dismissed.

More fundamentally, the Court should reject Plaintiffs' combined claims due to their failure to comply with Rule 9(b)'s heightened pleading standard. That rule requires Plaintiffs to plead the time, place, and content of any alleged misrepresentation, *Mulder*, 865 F.3d at 22, as well as "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading," *Cardinale*, 567 F.3d at 12. The Amended Complaint does no such thing. Instead, it alleges broadly that Harvard "misrepresented its diversity, equity and inclusion policies *throughout the years*," Am. Compl. ¶ 116 (emphasis added); that Harvard "knew that its statements *over the years* regarding equity and diversity were false," *id.* ¶ 117 (emphasis added); and that Harvard generally "misrepresented to Plaintiffs how donations would be used by Harvard," *id.* ¶ 120. These are precisely the kinds of vague and conclusory statements that cannot constitute unlawful misrepresentation of fact. *See Cardinale*, 567 F.3d at 13 ("general averment of the defendant's 'knowledge' of material falsity" is insufficient under Rule 9(b)). For that additional reason, Plaintiffs fraud and misrepresentation claims must be dismissed.

**VI.**    <u>**Plaintiffs' Unjust Enrichment Claim Is Invalid.**</u>

"[T]o state a claim for unjust enrichment a plaintiff must prove (1) a benefit conferred

upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the

defendant; and (3) the acceptance or retention of the benefit by the defendant under

circumstances which make such acceptance or retention inequitable." *Stevens v. Thacker*, 550 F.

Supp. 2d 161, 165 (D. Mass. 2008) (citing 12 Williston on Contracts § 1479). As with their

implied contract claim, Plaintiffs' unjust enrichment claim is based on two theories: their tuition

payments and their alleged donations.

As for the tuition-based theory, Plaintiffs admit that they attended Harvard and graduated

with various degrees between 1973 and 1996. *See* Am. Compl. ¶¶ 22–32. Plaintiffs received

exactly what their tuition entitled them to: an education and, upon successful completion of all

prerequisites, a degree. The theory that, decades after their graduation, they can recoup their

tuition based on disagreements with Harvard's operational decisions is unsupported by any law,

*see Brown* 2016 WL 206465, at *3; *Ad Hoc Comm.*, 726 F. Supp. at 523; *Leach*, 2007 WL

1574409, at *3; *In re Milton Hershey Sch.*, 911 A.2d at 1263; *Mercer Univ.*, 371 S.E.2d at 861;

*Tishok*, 113 A.2d at 123; *Russell*, 737 A.2d at 944–46; *Comm. to Save Polytechnic*, 2009 WL

222097, at *5; *Steeneck*, 1994 WL 463629, at *7, and would impermissibly frustrate the missions

of universities if it were. Moreover, and as discussed above, the donation-based theory must be

dismissed because "only the Attorney General can bring an action alleging the misuse of

charitable assets." *Weaver*, 425 Mass. at 275.

**VII.**    <u>**Plaintiffs' Breach of Fiduciary Duty Claim Must Be Dismissed.**</u>

Finally, Plaintiffs' breach-of-fiduciary-duty claim necessarily rests upon their contention

that Harvard has a fiduciary duty to its alleged donors. Am. Compl. ¶¶ 127–29. But, as

previously explained, no such duty between a university and its alumni or donors has ever been

recognized by any Massachusetts court. *See Lopez v. Medford Community Center, Inc.*, 384 Mass. 163, 167 (1981) (quoting *Ames*, 332 Mass. at 250–51) ("It remains the general rule that 'it is the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings'"); *accord Harvard Prison Divestment Campaign*, 2081CV00510, at *9 (rejecting fiduciary duty claim brought by alleged donors against Harvard for lack of standing); *Brzica v. Trustees of Dartmouth Coll.*, 791 A.2d 990, 994 (N.H. 2002) (concluding that no fiduciary relationship existed between trustees of Dartmouth College and alumni who had contributed to capital improvement fund where alumni sued to prevent use of contributions in plan to eliminate single-sex fraternities and sororities). While Plaintiffs' status as Harvard alumni may well heighten their interest in Harvard's activities, there is simply no legal support for the notion that a university has a fiduciary relationship with its graduates or donors.

## VIII.   **Plaintiffs' Claims Are Barred by the Applicable Statutes of Limitations.**

In Massachusetts, the limitations period for a breach-of-contract claim is six years. Mass. Gen. Laws ch. 260, § 2; *Creative Playthings Franchising, Corp. v. Reiser*, 463 Mass. 758, 758 (2012). Claims sounding in tort are subject to a three-year limitations period. Mass. Gen. Laws ch. 260, § 2A. To the extent that Plaintiffs' claims are based on their tuition payments or their status as alumni, the statute of limitations ran long ago. And where Plaintiffs allege that "[f]or the last decade, Harvard has known of, tolerated and enabled antisemitism in manifold ways in direct contravention of its stated diversity, equity and inclusion policies," Am. Compl. ¶ 54, they cannot claim that the discovery rule tolls the limitations period. Under the discovery rule, a cause of action accrues "'when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006) (quoting *Bowen v. Eli Lilly & Co.*,

408 Mass. 204, 205–06 (1990)). Here, the Amended Complaint contains multiple allegations of conduct occurring as early as 2014 that, if accepted as true, should have put Plaintiffs on notice of their claims. *See* Am. Compl. ¶¶ 50–52, 54–57, 59–60. Accordingly, this Court may properly dismiss Plaintiffs' claims on this additional ground.

## CONCLUSION

For the foregoing reasons, Harvard respectfully requests that this Court enter an order dismissing Plaintiffs' Amended Complaint with prejudice.

Respectfully submitted,

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,

/s/ *Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
dcloherty@clohertysteinberg.com
Victoria L. Steinberg (BBO #666482)
vsteinberg@clohertysteinberg.com
Alexandra Arnold (BBO #706208)
aarnold@clohertysteinberg.com
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
617-481-0160

Dated: July 15, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, this document was filed through the ECF system and will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing.

/s/ *Daniel J. Cloherty*
Daniel J. Cloherty